REBECCA ATTARD,

                Plaintiff,　　　　　　　MEMORANDUM AND ORDER

      -against-　　　　　　　　　　　　05-CV-2129 (JG) (RML)

NEW YORK CITY DEPARTMENT
OF EDUCATION,

                Defendants.
----------------------------------------------------------------x

A P P E A R A N C E S:

    GREGORY S. ANTOLLINO
        116 West 22nd Street, 5th Floor
        New York, New York 10011
        *Attorney for Plaintiff*

    MICHAEL A. CARDOZO
        Corporation Counsel
        City of New York
        100 Church Street
        New York, New York 10007
    By:   Ivan A. Mendez
        Jason R. Bogni
        *Attorney for Defendant*

JOHN GLEESON, United States District Judge:

        This action arises out of the termination of Rebecca Attard from her position as a tenured English teacher at Port Richmond High School in Staten Island. Attard claims that she was given poor performance reviews and ultimately fired because of her age, in violation of the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621 *et seq.*, and the New York City Human Rights Law (NYCHRL), N.Y.C. Admin. Code § 8-101 *et seq.* Her former employer, the New York City Department of Education, moves for summary judgment, arguing

that she was legitimately dismissed for incompetence and insubordination.[1] I grant the motion for the reasons set forth below.

BACKGROUND

The following account is based on the evidence viewed in the light most favorable to Attard.

Between 1985 and 2001, Attard taught English at Clara Barton High School, a public high school in Brooklyn. Although her supervisors, who observed her classes two to three times a year, criticized her for, among other things, failing to police private conversations between students, they also praised her abilities. In her 16 years at Clara Barton, Attard was never awarded less than a "satisfactory" rating in an evaluation. In the spring of 2001, Attard requested, and was granted, a transfer based on her years of service to Port Richmond High School in Staten Island, where she lived. She was then 52 years old.

On the first day of school, Attard tried to introduce herself to the principal, Robert Graham, after a meeting of the entire teaching staff in the student lunchroom. Although she offered to shake his hand, he only nodded to her and moved on. He was busy, however, and may not have noticed that she had extended her hand. The same day, Attard also attended an English Department meeting, at which the chair, Assistant Principal Louise MacCallum, directed the teachers to assign group work as often as possible.

In October, MacCallum observed one of Attard's classes for the purpose of evaluating her. She was the first administrator to do so. Although she rated the lesson "satisfactory," she noted in her report that the class had "many problems" that she hoped would

---

[1] In her opposition brief, Attard withdrew her claims under the Age Discrimination Act of 1975, 42 U.S.C. § 6101-6107, and her claims against the City of New York. She also agreed that her former employer is properly referred to as the New York City Department of Education, not the Board of Education of the City of New York. The Clerk is respectfully directed to amend the caption accordingly.

be corrected before her next observation. As was typical, MacCallum discussed her immediate reactions with Attard in a post-observation conference and sent her a typed report a few days later. For her part, Attard found this initial observation "pleasant" and MacCallum "very friendly."

Graham, with whom Attard had seldom interacted since she arrived at Port Richmond, observed one of her classes for the first time in late November. He gave her an "unsatisfactory" rating because, he wrote in his report, she failed to enforce a rule prohibiting students from wearing hats in class, permitted too much talking during instruction, did not summarize the lesson at the end of the class, and failed to assign any written homework.

Attard disputed Graham's report in a letter. She admitted that she may not have asked students to remove their hats, but said she would have if Graham had not done so first. What Graham characterized as talking out of turn she claimed was actually part of the class discussion. In fact, she argued, it was the students' enthusiastic participation that left her without time to give a summary of the material, a practice she agreed was generally helpful. She also noted that while it was true she had not assigned any homework that day, she had given the students an ongoing assignment that she collected weekly. Attard did not attribute Graham's criticism to deficiencies in her teaching method, but felt he was singling her out for some other reason, perhaps her age. As she testified, "[H]e didn't like me, I don't know personally or he wanted me out of the school, but I didn't think it was the teaching."

After Graham's negative report, Attard consulted a union representative, Mike Kramer, who advised to her to carefully follow any rules so that her noncompliance could not be held against her. He also told her that Graham "favored the young girls," which she understood

as a reference to Graham's sexual preference for younger female teachers, with one of whom he was rumored to be having an affair.

In December, MacCallum again rated Attard's performance. She rated it "unsatisfactory," citing a "lack of classroom management [that] makes learning of any kind almost impossible in the classroom." At the post-observation meeting, MacCallum spontaneously told Attard, "We would like to get rid of you." When Attard asked her why, MacCallum said that her methods were "old-fashioned" and that she did not fit at in the school. By "old-fashioned," MacCallum explained that she meant Attard was relying on "old developmental lessons," not "group work," and she urged Attard to "go look at the younger teachers" because "they do group work."

Attard considered MacCallum's comments discriminatory and consistent with her behavior at department meetings, where she complimented teachers under age 40 for making engaging posters, for example, or assigning group work, but never verbally praised older teachers. Attard submitted a one-paragraph letter objecting to the evaluation, in which she disputed MacCallum's characterization of the class and accused Graham and MacCallum of discriminating against her because of her age and conspiring to force her to resign. (She also attached the letter to every negative observation report or written criticism she subsequently received.) In addition, Attard reported to Graham MacCallum's statement that she wanted to get rid of her. He indicated that he did not condone the remark and told Attard to try to get along with MacCallum as well as she could.

In late January 2002, Graham sent Attard a critical letter recounting an incident in which he discovered some of her students in the hall without passes. Although Attard believed his version of events was inaccurate, she decided it would be futile to specifically dispute the

letter because she was convinced that he would ensure that she received an "unsatisfactory" rating for the year whatever she did. She was not concerned that the letter, unrebutted, might lead to a poor annual rating; a union representative had advised her that it was unlikely she could be forced out before she planned to retire.

MacCallum observed Attard in March and repeated her previous criticisms, writing that "[t]here were numerous problems with this lesson, but the overriding concern is in the area of classroom management and discipline." She directed Attard to observe three teachers, to meet with her to discuss their techniques, and to review lesson plans with her weekly.[2] She concluded the report with a warning that Attard's continued unsatisfactory performance "may lead to disciplinary action including an unsatisfactory rating at the end of this school year." Later in March, Graham also observed Attard. Like MacCallum, he reiterated his previous criticisms, particularly those concerning classroom discipline, and warned her that she could receive an adverse rating for the school year.

By this time, Attard, resigned to unsatisfactory reviews, no longer read observation reports carefully, but only glanced through them. She observed only one of the teachers that MacCallum instructed her to observe and reviewed lesson plans with MacCallum only a few times. Attard blamed their failure to meet on MacCallum, who she said was often not in her office at the appointed time. She also admitted, however, that she thought the meetings were a "sham" and that she made no effort to reschedule them because her relations with MacCallum were "fairly hostile."

In May, a representative from the local superintendent's office, Lawrence Gambella, observed one of Attard's classes. He noted that several students left the room without

---

[2] According to Attard, two of the three teachers MacCallum told her to observe were in their twenties.

permission during the period, that one even wrote her own hall pass, and that students were "extremely noisy and unruly" the entire time.

Attard received an overall rating of "unsatisfactory" for her performance during the 2001-02 school year. Although she earned "satisfactory" ratings in certain categories, such as "attendance and punctuality" and "effort to establish and maintain good relationships with teachers," she received an "unsatisfactory" rating for every discrete skill assessed under the rubric of "Pupil Guidance and Instruction." These included "control of class," "planning and preparation of work," and "skill in making class lessons interesting to pupils."

Attard formally grieved the rating. During the following October or November, a hearing was held before a panel of three principals from other schools whom she had never met before. She, Graham, and MacCallum each had an opportunity to present evidence, and her union representative at the hearing argued that her negative evaluations were the result of age discrimination. The panel denied her grievance a few weeks later in a short form letter.

Attard continued to receive poor performance reviews in the 2002-03 school year. In a September report, MacCallum noted that there was "little discipline" and "no organization" in her classroom. MacCallum reported that more than half of the students in a class in November were absent and that Attard still failed to enforce basic rules or assign homework. In January, Graham wrote that Attard continued to permit too much talking and tardiness and had failed to plan a homework assignment. In February, MacCallum faulted her for imposing no penalty when students ignored her and counted twelve late students and ten absent ones. In April, MacCallum criticized her lessons as "unfocused" and said she did not appear to be using a lesson plan template MacCallum had provided. The same month, Graham noted in an observation report that she was unable to produce a lesson plan when he requested it at the end of the class,

adding, "It is extremely troubling that you continue to disregard recommendations made by me and Ms. MacCallum." As she had the year before, Attard believed that MacCallum and Graham's descriptions of her classes were inaccurate and their criticisms meritless, but that it was pointless to grieve or otherwise dispute their evaluations. She limited herself to attaching to the evaluations the same one-paragraph letter that she had initially composed in response to MacCallum's December 2002 observation report.

In June, Attard again received an overall rating of "unsatisfactory" for the 2002-03 school year. Her ratings in individual categories remained the same as they were the previous June, except that she was deemed "unsatisfactory" in "maintenance of good relations with other teachers and supervisors," a category in which she had earned a "satisfactory" rating the year before.

Local Instructional Superintendent Nancy Ramos, a regional administrator, observed one of Attard's classes in September 2003. Her report emphasized Attard's failure to impose discipline. "The majority of your students were not engaged in learning," Ramos wrote. "Throughout the lesson, private conversations by students were permitted. Frequent shouting out of answers by students, calling out for the pass, calling out to ask you go to the nurse is a clear example of your students not being engaged in your lesson. This was permitted throughout the period."

At the post-observation conference, Attard interrupted Ramos shortly after she began giving her critique. "Listen," Attard said. "I know you are here to give me an unsatisfactory. Do what you want." Then she walked out of the meeting.

A few weeks later, on October 1, 2003, the Department of Education administratively removed Attard from her classroom teaching position. On October 28, it served

her with fifteen disciplinary charges alleging conduct unbecoming the teaching profession, neglect of duty, and insubordination. The charges were brought and adjudicated in accordance with the collective bargaining agreement between the United Federation of Teachers and the New York State Department of Education and with New York Education Law § 3020-a, which governs disciplinary procedures and penalties for tenured teachers in public schools.

The disciplinary hearing took place over nine days in January and February of 2004 before a hearing officer, a labor arbitrator mutually agreed upon by Attard and the Department of Education. At the hearing, Attard, who was represented by union counsel, argued that punishing her was not appropriate because much of her alleged misconduct involved incidents beyond her control or for which she could provide a credible explanation. She also argued that there was "a general feeling of hostility" toward teachers who received transfers to Port Richmond because of their seniority.

In a written decision issued April 22, 2004, the arbitrator found that the Department of Education had proven the disciplinary charges against Attard by a preponderance of the evidence and recommended her dismissal. The Department of Education, statutorily bound to abide by his decision, terminated Attard's employment on May 7, 2004.

DISCUSSION

A.   *Standard*

Summary judgment is appropriate only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712,

720 (2d Cir. 2010). "A fact is material if it might affect the outcome of the suit under the governing law." *Id.* When applying this standard, the court must "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001).

B.  *Analysis*

Employment discrimination claims under the ADEA, 29 U.S.C. § 621 *et seq.*, and the NYCHRL, N.Y.C. Admin. Code § 8-101 *et seq.*, are both subject to the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), for claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. *See, e.g.*, *Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010); *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 305 n.3 (2004). Under that framework, a plaintiff claiming age discrimination bears the initial burden of making a prima facie case by showing that (1) she was at least 40 years old, (2) she was qualified for her position, (3) she experienced an adverse employment action, and (4) the action occurred under circumstances giving rise to an inference of discrimination. *Gorzynski*, 596 F.3d at 107; *see* 29 U.S.C. § 631(a) (limiting the ADEA's protections to individuals who are at least 40 years old). If she succeeds, the burden shifts to the defendant to articulate "some legitimate, nondiscriminatory reason" for the action. *Gorzynski*, 596 F.3d at 106. Upon the defendant's proffer, "the pattern of presumptions and burden shifts established by *McDonnell Douglas* . . . drops away." *Tomassi v. Insignia Fin. Group*, 478 F.3d 111, 114 (2d Cir. 2007). For ADEA claims, the question on summary judgment becomes simply whether the evidence, viewed in the light most favorable to the plaintiff, can sustain a reasonable finding that her age was the "but-for" cause of the adverse action. *See Gorzynski*, 596 F.3d at

105-06.  For NYCHRL claims, the question is whether the evidence can sustain a reasonable finding that the adverse action was motivated even in part by age.³

Because the Department of Education claims that it lawfully terminated Attard for insubordination and incompetence, I need not decide whether she has made a prima facie case and instead may proceed directly to the ultimate inquiry.  *See U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) ("Where the defendant has done everything that would be required of him if the plaintiff had properly made out a *prima facie* case, whether the plaintiff really did so is no longer relevant.").

1.  *Disparate Treatment*

Taken in its entirety, the evidence cannot sustain an inference that Attard's termination was motivated in part by intentional age discrimination.  The consistently negative reviews she received from MacCallum and Graham formed the basis of her two "unsatisfactory" annual ratings and the arbitrator's conclusion that she should be dismissed, but she offers only the slightest evidence that either administrator was motivated by discriminatory animus.

Attard claims that MacCallum criticized her teaching methods as "old-fashioned" and urged her to observe "the younger teachers."  Attard acknowledged, however, that

---

³ In 2005, the New York City Council passed the Local Civil Rights Restoration Act of 2005 (Local Law No. 85 of the City of New York), amending the NYCHRL in various respects.  The most important was the revision to the statute's construction provision, which now requires not merely that the statute be liberally construed but that it be so construed "for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title, have been so construed."  N.Y.C. Admin. Code § 8-130.  Before the passage of the Restoration Act, judges had interpreted the NYCHRL to mirror the protections of Title VII and the ADEA.  *See, e.g.*, *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 71 n.1 (2d Cir. 2005).  Now, however, "interpretations of State or federal provisions . . . may be used as aids in interpretation only to the extent that the counterpart provisions are viewed as a floor below which the City's Human Rights Law cannot fall, rather than a ceiling above which the local law cannot rise."  *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 32 (1st Dep't 2009) (internal quotation marks omitted).  Accordingly, the First Department has recently analyzed a sex discrimination claim brought under the NYCHRL as it would have been analyzed under Title VII in 1991.  *See id.* at 35; *see also Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (citing *Williams* with approval for its discussion of the Restoration Act).  Similarly, I analyze Attard's NYCHRL claim as requiring that she prove only that age was a factor in her dismissal, the standard for recovery under the ADEA and Title VII in 1991, before the Supreme Court held in *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343 (2009), that the ADEA, unlike Title VII, requires a plaintiff to prove that age was the "but-for" cause of the challenged adverse employment action.

MacCallum explained at the time that she meant Attard was relying on "old developmental lessons" instead of assigning "group work" as the younger teachers did. And as Attard testified, MacCallum had directed all of the English teachers at a meeting on the first day of school to assign group work as often as possible. In this context, MacCallum's comments merely evince disapproval of what she viewed as Attard's outdated instruction style. They cannot be reasonably interpreted as probative of animosity against older people in general. In addition, MacCallum's praise of younger teachers at departmental meetings was also not evidence of a latent prejudice against older teachers. Her compliments did not refer to teachers' ages or to any group of people as a class, but instead commended specific acts by specific individuals. Consequently, they do not reflect a "discriminatory state of mind." *See Tomassi*, 478 F.3d at 116 ("The relevance of discrimination-related remarks . . . depend[s] . . . on their tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class.").

    The evidence that Graham discriminated against Attard on the basis of her age is even weaker than the evidence that MacCallum did. Attard makes much of Graham's supposed aloofness when she tried to shake his hand on the first day of school in 2001, but she concedes that she approached him after a large meeting when he was busy, that he nodded to her, and that he might not have seen her offer her hand. The incident does not suggest that Graham even disliked her, much less that he avoided her because of her age. Attard also cites rumors that Graham was having an affair with a younger female teacher. The rumors are inadmissible hearsay, but even if they could be considered, they suggest a romantic preference for a single younger woman, not a professional bias against older people as a class. *See Sarno v. Douglas*

*Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999) (hearsay assertion that would be inadmissible if testified to at trial may not be considered on a summary judgment motion).

The value of what little evidence there is of a discriminatory motive on the part of MacCallum and Graham is further diminished by the confirmation of their criticisms by administrators who did not work at Port Richmond High School. Two regional administrators, Ramos and Gambella, conducted their own observations before seconding MacCallum and Graham's recurring complaint that Attard's classes suffered from a lack of discipline. And a panel of three principals from other schools upheld Attard's "unsatisfactory" rating for the 2001-02 school year after a hearing in which her union representative argued that she was a victim of age discrimination. Attard offers no basis to infer that these administrators were biased against her because of her age.

Finally, and most importantly, Attard was terminated for incompetence and insubordination only after the disciplinary charges against her were sustained by an arbitrator that she and the Department of Education selected together and whose neutrality she does not dispute. *See* N.Y. Educ. Law § 3020-a(3)(b)(ii) ("[T]he employing board and the employee . . . shall by mutual agreement select a hearing officer . . . ."). In the proceedings before the arbitrator, which culminated in a nine-day hearing, Attard was afforded extensive procedural rights, including the opportunity to take discovery, cross-examine witnesses, and present oral and written argument. Although Attard appears to claim that the arbitrator could not legally consider her defense that the negative evaluations were a pretext for age discrimination, § 3020-a explicitly states that it does not constrain the defenses that may be asserted by teachers charged with incompetence. *See* N.Y. Educ. Law § 3020-a(3)(c)(i-a)(B). Moreover, Attard's union counsel at least obliquely suggested that she was a victim of age discrimination by arguing that

there was an atmosphere of hostility against teachers who had received transfers to Port Richmond based on their seniority. The arbitrator rejected Attard's claim that the negative reviews were pretextual in a reasoned 53-page opinion, concluding that "there is no evidence to suggest that the charges . . . are the result of animus between [Attard] and the Principal." Hearing Officer Decision 24.

When a termination is executed in accordance with an arbitrator's decision in circumstances such as these, a claim that it was discriminatory cannot survive a summary judgment motion unless the plaintiff "present[s] strong evidence that the [arbitration] decision was wrong as a matter of fact -- e.g. new evidence not before the tribunal -- or that the impartiality of the proceeding was somehow compromised." *Collins v. N.Y.C. Transit Auth.*, 305 F.3d 113, 119 (2d Cir. 2002). Attard, who testified vaguely about a high-level conspiracy within the Department of Education to "force out" older teachers, claims that she does have new evidence: statistics showing that in New York City schools, disciplinary charges served pursuant to § 3020-a were disproportionately brought against teachers over age 40 in the 2002-03 and 2003-04 academic years. She argues these statistics support her theory that MacCallum and Graham, acting at the behest of unnamed superiors, created a sham paper trail of negative evaluations to justify bogus disciplinary charges.

The statistics purport to show that while the percentage of tenured teachers who were over age 40 was between 53.3% and 68.0% (depending on the variables used to identify the total population of tenured teachers) in 2003-04 school year, the percentage of teachers served with § 3020-a disciplinary charges who were over age 40 was between 83.2% and 90.5%.[4]

---

[4] Data provided by the Department of Education was the basis for the 83.2% figure, and data provided by the United Federation of Teachers was the basis for the 90.5% figure.

Attard's statistician, Dr. Harriet Zellner, opined that the disparity in these rates was statistically significant, that is, the disparity was highly unlikely to be due to chance.[5]

There are at least two reasons why these statistics, even if credited, do not buttress Attard's discrimination claim. The first is that Attard claims that she was a victim of the Department of Education's effort to "force out" older teachers. To show that the Department of Education "forced out" older teachers at a statistically significant higher rate than younger teachers, Attard would have to present statistics that compare the termination rate for each group. Although the institution of § 3020-a charges is a necessary first step to firing a tenured teacher, it is not a necessary first step to firing any teacher and it does not guarantee that termination will ensue. Because the statistics Attard offers relate only to the institution of § 3020-a charges, they simply do not go to the issue of whether the adverse employment action she suffered (termination) was more likely to be taken against older teachers.

Second, the statistics were unaccompanied by any attempt to determine whether there is a lawful explanation for the fact that tenured teachers over age 40 were more likely to be served with § 3020-a charges than tenured teachers under age 40. Zellner's hypothesis testing showed only that chance was most likely not responsible for the disparity between the proportion of tenured teachers who are over age 40 and the proportion of tenured teachers served with § 3020-a charges who are over age 40. As the Second Circuit has recognized, "this methodology could not, by itself, support a conclusion that discrimination must have been the cause for the disparity."[6] *Smith v. Xerox Corp.*, 196 F.3d 358, 371 (2d Cir. 1999), *overruled on other grounds by Meacham v. Knolls Atomic Power Lab.*, 461 F.3d 134, 141 (2d Cir. 2006). To take just one

---

[5] The 2002-03 statistics are substantially similar.
[6] Zellner agreed. "In classical hypothesis testing, we recognize that -- when the results of our test imply rejection of the null hypothesis -- they do not, in and of themselves, imply the acceptance of a single alternative hypothesis in its place; a very large number of alternative hypotheses might explain the outcome we observe." 2008 Zellner Report 6 n.15.

example of a possible legitimate cause of the disparity, suppose that, of tenured teachers who anticipate § 3020-a charges, those under age 40 are more likely to resign before the service of charges than those over age 40. Perhaps younger teachers, whose pay and pension benefits are likely to be lower than those of older teachers, are more willing to relinquish their jobs to pursue teaching careers in other districts, or other careers altogether, rather than contest the charges. Absent a demonstration that the disparity remains after possible legitimate explanations such as this one are accounted for, the statistics do not support an inference that § 3020-a charges are more likely to be instituted against older teachers because of their age. Consequently, Attard has not proffered evidence -- statistical or not -- from which a reasonable factfinder could infer that she was discriminated against because of her age.[7]

2. *Other Theories of Discrimination*

Attard argues that the same evidence she submitted in support of her disparate treatment claim could also support a reasonable finding that she was discriminated against on a theory of disparate impact. In contrast to a claim of disparate treatment, "[a] plaintiff need not prove discriminatory intent to make out a claim of disparate impact." *See Xerox*, 196 F.3d at 364. "A plaintiff establishes a prima facie case of disparate impact by identifying a specific employment practice which, although facially neutral, has had an adverse impact on her as a member of a protected class." *Id.*

Attard has never identified a specific facially neutral employment practice of the Department of Education that has an adverse impact on teachers over age 40, not in her charge to the Equal Employment Opportunity Commission, her complaint, or even her opposition brief to this motion. In her EEOC charge, Attard attributed her negative performance reviews to

---

[7] Because I find that Zellner's statistical analysis does not support an inference of discrimination, I need not decide whether it is also inadmissible, as the defendant argues.

15

intentional age discrimination by Graham and the administrators supervising Staten Island schools, whom she claimed "systematically went after older teachers." Attard is correct that there is no requirement that a plaintiff use the phrase "disparate impact" to put the EEOC on notice that she is alleging that theory of discrimination. But the factual allegations made in the charge must be adequate to ensure that the facially neutral employment practice challenged as discriminatory "would fall within the scope of the EEOC investigation which can be reasonably be expected to grow out of the charge that was made." *Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir. 2003) ("In determining whether claims are reasonably related, the focus should be on the factual allegations made in the EEOC charge itself . . . ." (internal alterations and quotation marks omitted)). Because Attard never mentioned a facially neutral employment practice to the EEOC, she failed to pursue her administrative remedies with respect to a disparate impact claim and cannot assert one here. *See* 29 U.S.C. § 626(d)(1) (requiring that a plaintiff have timely filed a charge with the EEOC before suing under the ADEA).

Finally, Attard argues that the evidence as a whole could also support an inference that she was a victim of a pattern or practice of intentional discrimination against older teachers. A "pattern or practice" claim is a far more ambitious version of a disparate treatment claim, and it is not clear that it may be asserted in the first instance by an individual. *See Brown v. Coach Stores, Inc.*, 163 F.3d 706, 711 (2d Cir. 1998) (expressing skepticism that an individual plaintiff can assert a pattern or practice claim if a group of plaintiffs has not already "proven a history of systematic discrimination by the defendant employer"). I need not decide whether Attard may assert this type of claim because the only evidence she offers of a pattern or practice of discrimination by the Department of Education is Zellner's statistical analysis. As explained

above, a reasonable inference of intentional discrimination against older teachers could not be drawn from that analysis.

## CONCLUSION

For the foregoing reasons, the motion for summary judgment is granted. The Clerk is respectfully directed to enter judgment for the defendant and to close the case.

So ordered.

John Gleeson, U.S.D.J.

September 30, 2010
Brooklyn, New York